OPINION OF THE COURT
Carol R. Edmead, J.
In this CPLR article 78 proceeding, petitioners Prometheus Realty Corp., Portofino Realty Corp., Tuscan Realty Corp. and the Rent Stabilization Association of N.Y.C., Inc. (collectively, petitioners) move by order to show cause for a preliminary injunction and temporary restraining order staying respondents New York City Water Board and New York City Depart *747 ment of Environmental Protection (the DEP) (collectively, respondents) from issuing a $183 water bill credit, from implementing a 2.1% water rate increase, and directing that the fiscal year 2016 New. York City Water Board Water and Wastewater Rate Schedule (2016 rate schedule) remain in effect.
Factual Background
In 1984, the New York State Legislature enacted the New York City Municipal Water Finance Act, which created the New York City Municipal Water Finance Authority, and the Water Board, both public benefit corporations. The Water Finance Authority was created “to provide revenue bond financing” for improvements to New York City’s water and sewer infrastructure (Giuliani v Hevesi, 90 NY2d 27, 34 [1997]). The function of the Water Board[1] is, inter alia, “to provide sufficient funds—through fixing and collecting water and sewer charges and other revenues—for the City to operate and maintain the Water System and for the Authority to service water and sewer debt” (id.; see Public Authorities Law, art 5, tit 2-A, § 1045-j); the revenue is to permit the water and sewer systems to be “placed on a self-sustaining basis” (Public Authorities Law § 1045-g [4]).
On July 1, 1985, the City of New York entered into an agreement of lease under which the City leased the “Sewerage and Water Systems” to the Water Board[2] (the lease) (available at *748 http://www.nyc.gov/html/nycwaterboard/pdf/documents_and_ policies/nyc_water_board_lease_agreement.pdf, cached at http:// www.nycourts.gov/reporter/webdocs/nyc_water_board_lease_ agreement.pdf). As designated in article VIII of the lease, the Water Board is required to make payments to the City for costs incurred by the City attributable to the water systems (art VIII, §8.1 [a]). The Water Board is also required to pay the City certain base rental payments, “but only to the extent requested by the City in each Fiscal Year” (art VIII, § 8.2).
The City, the New York City Municipal Water Authority, and the Water Board also entered into a financing agreement, dated July 1, 1985 (the financing agreement) (available at http:// www.nyc.gov/html/nycwaterboard/pdfidocuments_and_policies/ nyc_water_board_financing_agreement.pdf, cached at http:// www.nycourts.gov/reporter/webdocs/nyc_water_board_finan-cing_agreement.pdf). Section 4.1 of the financing agreement requires that all revenues received by the Water Board “be deposited by the Board into the Local Water Fund” to be held “in trust” and “applied only as provided herein, in the [New York City Municipal Water Finance Authority] Act, in the Resolution[3] or in the Note Resolution”[4] (exhibit 10, § 4.1) to be disbursed in a specific manner and order of priority.
The DEP, as the Water Board’s contractual “billing agent,” operates and maintains the water system, and also charges and collects fees related to water and sewer usage (tr of oral argument, dated June 7, 2016 at 21). On April 8, 2016, the DEP issued a “FY17 Water Rate Proposal to the New York City Water Board” (the proposal) (available at http://www.nyc.gov/ html/nycwaterboard/pdf/public_notices/fyl7_dep_water_rate _proposal_web.pdf, cached at http://www.nycourts.gov/reporter/ webdocs/fy 17_dep_water_rate_proposal_web.pdf), explaining the need to “continue providing world-class drinking and wastewater services to New York City” (id. at 7). To maintain and improve their efforts to provide safe drinking water and *749 harbor waste, the DEP proposed a 2.1% increase for the 2017 fiscal year (FY) water rate (“the lowest increase in 16 years”) (id. at 17). As a result in the increase, the average annual single family water charge would increase by $23 (from $1,055 to $1,078); the multifamily conservation program residential units water charge would increase by $21 (from $1,005 to $1,026). Yet, 149,000 properties billed on the minimum charge would not incur the 2.1% increase.
DEP’s proposal also advised that the 2.1% increase would provide for, inter alia, a $250 water bill credit for up to 40,000 affordable units, and a $118 water bill credit to approximately 120,000 low-income, senior, and disabled homeowners. And, penalties for non-compliant buildings in the multifamily conservation program would be reduced to 10%.
Further, DEP’s proposal explains that the (minor) 2.1% increase was “made possible by,” inter alia, strong revenues in FY 2016, lower than expected operational and maintenance costs, and the Mayor’s waiver of $122 million (or 50%) of the estimated $244 million rental payment owed by the Water Board in FY 2017.[5] Yet, despite these “savings,” the debt service continued to drive the “revenue needs,” thereby warranting the 2.1% increase to fill the $76 million revenue gap (id. at 36, 38).
DEP presented this proposal at the Water Board’s meeting on April 8, 2016, and published a notice of public hearings to be held concerning the proposed changes, including the 2.1% rate increase, credits for multifamily affordable housing properties and senior property owners, and freezing the minimum charge for meter-billed customers.
Thereafter, on April 25, 2016, the Mayor announced the City’s decision to forgo the remaining $122 million rental payment owed by the Water Board and proposed that the Water Board issue a $183 credit on water and sewer bills of over 664,000 homeowners, in “keeping with the City’s past efforts to ensure bills stay as low as possible” (Mayor de Blasio Proposes *750 $183 Credit on Water & Sewer Bills for Over 664,000 Homeowners [Apr. 25, 2016], http://wwwl.nyc.gov/office-of-the-mayor/ news/390-16/mayor-de-blasio-proposes-183-credit-water-sewer-bills-over-664-000-homeowners/#/0). According to the announcement, this onetime credit “results from the Administration’s decision to no longer request a rental payment from the NYC Water Board, saving $244 million in FY 17 and $268 million in FY 18.”[6] The Mayor announced that the water bill credit applied to “all one to three-family homes across the city” to “provide some relief” to “keep water and sewer bills as low as possible” in order that “the fees NYC residents pay will be dedicated solely to the operation, maintenance and expansion of the water and sewer system.” The “water bill should be for one thing and one thing only—the cost of water,” insisted the Mayor.
Following this announcement, the Water Board published a revised notice of the hearings, which added the following: “4. Bill Credit: A bill credit based on the FY 2017 elimination of the rental payment.” The hearings were held and the bill credit was addressed.[7]
The Water Board then issued a public notice, announcing that “after public hearings,” it adopted a resolution at its May 20, 2016 annual meeting, approving the 2.1% increase for the “fiscal year commencing July 1, 2016 (‘FY 2017’).” As relevant herein, the Water Board also adopted “[a] one-time bill credit of $183 based on the elimination of the FY 2017 rental payment for each water and sewer account identified by [New York City] DOF[8] as a Tax Class 1 property.” The public notice included a reference to website address of the rate schedule, which reiterated that the “one-time bill credit of $183 on his/ her DEP account based on the City’s elimination of the FY 2017 rental payment” (at 37).
The Water Board posted the FY 2017 water rates, which include the 2.1% increase and the $183 bill credit on accounts identified by the DOF as tax class 1 property. The rates are effective July 1, 2016.
*751 In support of the petition[9] and preliminary injunctive relief, petitioners, as tax class 2 property owners, contend that the Water Board exceeded its authority and acted in an arbitrary, capricious, and unreasonable manner in adopting the FY 2017 rate schedule. The City’s relinquishment of the Water Board’s remaining $122 million rental obligation for FY 2017 eliminated the $76 million deficit, and resulted in a $46 million projected surplus, thereby eliminating the justification for the initial 2.1% increase stated in DEP’s proposal. Rather than using the surplus for costs of furnishing water services and/or avoiding the need to increase water rates, however, the Water Board adopted the 2.1% increase and adopted the Mayor’s proposal to issue “credits” to certain rate payers, i.e., one-, two-, and three-family homeowners in the City, who fall into what the DOF defines as tax class 1 property owners. The Water Board’s adoption of the Mayor’s proposal results in an increase in water rates on all ratepayers in order to fund credits issued to a limited class of property owners, a rate increase which bears no direct relationship to the cost of furnishing water. Class 2, 3 and 4 property owners are forced to pay a disproportionate share of the cost of water services without being proportionately benefitted in any way. The 2.1% increase in rates is needed solely to fund the credits issued to class 1 property owners. Thus, such increase amounts to an impermissible tax, and the court should annul both the Water Board’s resolution and rate schedule pursuant to CPLR 7803 (2) and (3).
In addition, the Water Board has no authority or jurisdiction under its enabling statute to issue any credits, such as the bill credit at issue. Notably, General Municipal Law § 94 authorizing municipal corporations to issue refunds from profits earned expressly states that the section does “not apply” to any water public utility service operated by the City. In any event, General Municipal Law § 94’s authorization of “refunds” does not include “credits” on future water bills in anticipation of *752 future profits. The New York State Comptroller has held that revenues of a water system cannot be used for purposes permitted by General Municipal Law § 94 until profits are earned. And, the bill credit also violates the financing agreement, which itemizes the list of expenditures and payments permitted, does not mention the issuance of credits. Likewise, the financing agreement states that any excess funds be deposited into a certain reserve fund for operation and maintenance. Thus, the court should annul the Water Board’s resolution pursuant to CPLR 7803 (2).
Even if authorized, the Water Board’s issuance of the bill credit is arbitrary, capricious, an error of law, and abuse of discretion. The bill credit is unrelated and bears no reasonable correlation to the costs of water service, and is designed to accommodate the Mayor’s political agenda to provide a windfall to certain homeowners. The DEP admitted that the bill credit results from the City’s decision to no longer request a rental payment from the Water Board. There was no factual analysis or rational basis to support a difference in the cost of delivery of water services to tax class 1 property owners as opposed to tax class 2, 3, or 4 property owners that would support a credit issued to only tax class 1 property owners or a credit in the amount of $183. Thus, the court should annul the Water Board’s resolution and rate schedule pursuant to CPLR 7803 (3).
Petitioners also seek injunctive relief pursuant to CPLR 7805, 6301, and 6313, arguing that there is a strong likelihood of success on the merits of their claims, that irreparable injury will result in the absence of injunctive relief, and that the balancing of the equities tip in favor of the relief requested. The respondents’ ultra vires act, in and of itself, constitutes irreparable harm. Further, in the absence of an injunction, the credits issued to the class 1 homeowners cannot practically be rescinded. If the Water Board cannot practically rescind the bill credit from class 1 homeowners, the Water Board will have improperly re-created a revenue needed to justify the 2.1% increase, leading to unnecessary economic waste. And, the refusal or failure of such homeowners to pay the increase may result in consequences, such as liens upon the premises, threats of foreclosure, and threats to creditworthiness, which are sufficient to establish irreparable harm. And, the short delay in issuing the credits will cause no apparent harm to the Water Board, which can hold the funds in reserve and operate at a *753 $46 million surplus until this matter is adjudicated. Should the court agree with petitioners, the Water Board would have no reason to increase the water rates based on the stated revenue needs in the FY 2017 proposal. Thus, the FY 2016 rate schedule should remain in effect. And, any undertaking imposed upon petitioners by the court, in its discretion, should be set in a nominal amount.
In opposition, respondents argue that the Water Board is independent of the Mayor, with such independence recognized by the fact that Public Authorities Law § 1045-j (9) prohibits the State’s Public Service Commission and city and state agencies from exercising any jurisdiction over the Water Board or the rates it establishes. The Water Board has broad authority to set rates or “other charges” (Public Authorities Law § 1045-j [1]) and “do all things necessary, convenient or desirable to carry out its purposes” (Public Authorities Law § 1045-g [17]). The Court of Appeals has found that “services rendered” can encompass actions broader than “the providing of water for current and predictable use” (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 59 [1978]). And, Public Authorities Law § 1045-j (1) (vi) authorizes the Water Board to issue the bill credit, in that it provides that the Water Board revenues may be used “to the extent requested by the city . . . pursuant to the agreement, to pay or provide for such other purposes or projects as such city considers appropriate and in the public interest.” Here, the City requested that the savings from the annual rent payments that the City was declining be passed on to the Water Board’s customers, to which the Water Board agreed. In FY 2017, the savings will be passed on to class 1 property owners, and in the subsequent three fiscal years, the savings will be passed on to all Water Board customers. Passing on the savings only to building owners of one to three units in FY 2017 was certainly in the public interest since the Water Board for years has administered a program, the Multiple-family Conservation Program (MCP), that benefitted thousands of multifamily (four or more units) building owners at costs to the Water Board of hundreds of millions of dollars.
Further, the adoption of the 2.1% increase and decision to issue the bill credit had a rational basis and was neither arbitrary nor capricious. The Water Board uses a five-year forecast in establishing its rates, and the 2.1% increase to base rates is projected to remain unchanged for the five years. Thus, it cannot be assumed that the rate increase is only for FY 2017. *754 The increase in revenue will continue into future years, even if there are no rate increases in those future years. If the rate increase is not implemented, the Water Board will lose revenue in FY 2017 and in projected revenue in future years. The 2.1% increase is necessary to service nearly $30 billion in outstanding Water Finance Authority debt and a multi-billion dollar capital improvement plan. And the Water Board’s ability to establish rates is critical to maintaining a strong credit rating, which in turn minimizes interest costs (which ultimately benefits the Water Board’s customers).[10]
Further, issuing the bill credit is neither arbitrary nor capricious. The Water Finance Act and Public Authorities Law § 1045-j (3) contemplate that there will be different rates and charges for different classes of users.[11] Although the Water Board charges for actual water usage, the Water Board has a variety of initiatives not based on actual usage that ease the financial burden on certain classes of customers. For example, owners of buildings (with four or more apartments) in the MCP are billed on a flat rate for water and wastewater services instead of a metered rate that measures actual water consumption.[12] MCP is not available to class 1 property owners. Owners in MCP typically use 30% more water than they actually are billed for, resulting on an average savings of $300 per apartment unit. In FY 2016 this initiative provided a benefit totaling approximately $266 million. Given the significant benefit *755 that MCP property owners have received, it is not irrational to provide a onetime credit to the vast majority of the Water Board customers.
Respondents maintain that the onetime bill credit is essentially no different than the Water Board assessing different rates for different classes of customers. And, the elimination of the $183 credit would result in a small reduction in rates, from 2.1% to 1.9%, resulting in small savings for a typical city apartment unit of $1.37.
Further, that General Municipal Law § 94 does not permit the issuance of a refund by a water service operated by the City ignores that the issuance of the credit is not a refund.[13]
Respondents maintain that petitioners are unlikely to succeed on the merits for the reasons set forth above. Further, conclusory allegations cannot establish irreparable harm. And, the balance of equities favors the Water Board. The only harm that petitioners face is an economic one, which does not constitute irreparable harm. If petitioners ultimately prevail, the customers that paid the 2.1% rate increase will have their accounts credited. However, if the Water Board is enjoined, the Water Finance Authority’s strong credit rating could be negatively impacted, resulting in increased interest costs, which in turn, could result in a dramatic rate increase in FY 2018 to make up the projected shortfall of hundreds of millions of dollars to the detriment of the customers. And if the Water Board eventually prevails, a preliminary injunction that stays the 2.1% increase would require that the Water Board back bill more than 800,000 customers, and the operational cost to back bill accounts could exceed the amount of revenue generated by the bills, making it fiscally impractical. And, upon receipt of the back bills, many Water Board customers will be faced with particularly high bills, and find it difficult to make these back payments. Further, new initiatives scheduled to begin on July 1st (as set forth in the FY 2017 rate schedule) will not go forward if the FY 2017 rate schedule is stayed, and the FY 2016 rate schedule remains in effect.[14] Since the balance of *756 equities favors the Water Board, the preliminary injunction motion should be denied.
Discussion[15]
In a proceeding brought pursuant to CPLR 7803 (2) for writ of prohibition (first cause of action), the petitioner must establish that “(1) a body or officer is acting in a judicial or quasi-judicial capacity, (2) that body or officer is proceeding or threatening to proceed in excess of its jurisdiction and (3) petitioner has a clear legal right to the relief requested” (Matter of Town of N. Hempstead v County of Nassau, 32 Misc 3d 809, 814 [Sup Ct, Nassau County 2011], affd 103 AD3d 734 [2d Dept 2013], appeal dismissed 21 NY3d 909 [2013], citing Matter of Town of Huntington v New York State Div. of Human Rights, 82 NY2d 783 [1993]; Matter of Power v New York State Div. of Hous. & Community Renewal, 61 AD3d 544 [1st Dept 2009]).
In support of relief pursuant to CPLR 7803 (3), petitioners must establish that a determination was made in violation of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion. An action is arbitrary and capricious, or an abuse of discretion, when the action is taken “without sound basis in reason and . . . without regard to the facts” (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]). Rationality is the key in determining whether an action is arbitrary and capricious or an abuse of discretion (Matter of Pell v Board of Educ., 34 NY2d at 231). The court’s function is completed on finding that a rational basis supports the agency’s determination (see Matter of Howard v Wyman, 28 NY2d 434 [1971]). Where the agency’s interpretation is founded on a rational basis, that interpretation should be affirmed even if the court might have come to a different conclusion (see Matter of Mid-State Mgt. Corp. v New York City Conciliation & Appeals Bd., 112 AD2d 72 [1st Dept 1985], affd 66 NY2d 1032 [1985]).
*757 While the Water Board’s purpose is to “benefit” the people of the city and the state, and improve “their health, welfare and prosperity” (Public Authorities Law § 1045-f [9]), the “[g]eneral powers of the water board” are found in Public Authorities Law, article 5, title 2-A, § 1045-g. The powers enumerated in Public Authorities Law § 1045-g (1) through (16) include, with certain limitations, the power to sue; have a seal; make and amend bylaws; establish, fix, revise, charge and collect fees, rates, rents and other service charges; enter contracts necessary to carry out its express powers; purchase and lease property; appoint officers and employees; acquire title to the sewage and water systems from the City; to use the City’s surveys, studies, and data; to use city employees; to accept gifts or grants for certain purposes; to invest moneys not required for immediate use; and to establish reserves to be held in trust as may be required by the City.
Specifically, Public Authorities Law § 1045-g (4) grants the Water Board the power to
“establish, fix, revise, charge and collect and enforce the payment of all fees, rates, rents and other service charges for the use of, or services furnished by the sewerage system, water system, or both, as the case may be, so as to receive revenues which, together with other revenues available to the board, if any, shall be at least sufficient at all times so that such system or systems shall be placed on a self-sustaining basis.”
Indeed, the enumerated powers speak of the collection of revenue, or actions taken in furtherance of the collection of revenue as they relate to the use of, and service by, the water and sewage systems. None of these powers includes the authority or power to set or increase rates to solely fund credits. Consequently, the last catchall section of this provision, Public Authorities Law § 1045-g (17), which empowers the Water Board to “do all things necessary, convenient or desirable to carry out its purposes and for the exercise of the powers granted in this title,” is limited to the powers previously noted; the last catchall section does not expand the authority of the Water Board to impose rate increases solely to fund credits in an arbitrary manner.
As to Public Authorities Law § 1045-j (1), entitled “Imposition and disposition of sewer and water fees, rates, rents or charges,” the Water Board is also authorized to
*758 “establish, fix and revise, from time to time, fees, rates, rents or other charges for the use of, or services furnished, rendered or made available by, the sewerage system or water system ... in such amount at least sufficient at all times so as to provide funds in an amount sufficient together with other revenues available to the board, if any, . . . (vi) to the extent requested by the city in or pursuant to the agreement, to pay or provide for such other purposes or projects as such city considers appropriate and in the public interest. Any surplus of funds remaining in the water board after such payments have been made shall be returned to the city for deposit in the general fund.” (Emphasis added.)
While this latter provision grants the Water Board authority to set fees for use of or services furnished by the water and sewage systems in an amount that would be sufficient to fund “other purposes or projects as” the City considers “appropriate and in the public interest,” such authority is limited to requests by the City pursuant to the financing agreement, and does not include the power to set fees or rates for the sole purpose of issuing credits. Here, the 2.1% increase bore no direct relationship to the use of or services furnished by water and sewerage systems. Section 6.1 of the financing agreement (rate covenant) specifies the use of funds collected by the Board to “provide for” the payment of the debt service, operation and maintenance of the water system, and all other payments required pursuant to the financing agreement and the lease, none of which includes the purpose of offsetting any water bills by issuing credits unrelated to usage. Article IV of the financing agreement also contemplates the maintenance of surplus funds and specifies the manners in which such surplus may be distributed, none of which encompass the issuance of credits in the distinct manner undertaken by the Water Board herein.
Nor can the assessment of “fees, rates, rents and other service charges,” though broad, be thinly disguised taxes.
In this regard, taxes “are imposed for the purpose of defraying the costs of government services generally,” whereas fees are the “costs of special services upon the one who derives a benefit from them” (Albany Area Bldrs. Assn. v Town of Guilderland, 141 AD2d 293, 298 [3d Dept 1988] [emphasis omitted]).
Fees charged that are “exacted for revenue purposes or to offset the cost of general governmental functions . . . are *759 invalid as an unauthorized tax” (Matter of Phillips v Town of Clifton Park Water Auth., 286 AD2d 834, 835, 836 [3d Dept 2001] [finding that the Town’s assessment of source and storage fees on two new construction office buildings that “actually fund(ed) improvements to the water system which benefit everyone” imposed the burden of capital improvements that benefitted all users of the system upon a discrete group of residents, and thus, “the true nature of the subject source and storage fees is that of a prohibited tax”], citing Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 58 [1978] [charges that the authority was authorized to collect were “fees,” which have to bear a direct relationship to the cost of furnishing the water services]). Stated differently, “Where the rates imposed must be paid regardless of the quantity of water used,” such charges are “taxes no matter how they are designated by the municipality” (State Univ. of N.Y. v Patterson, 42 AD2d 328, 329 [3d Dept 1973]; New York Tel. Co. v City of Amsterdam, 200 AD2d 315, 317 [3d Dept 1994] [“To the extent that (the) fees charged are exacted for revenue purposes or to offset the cost of general governmental functions they are invalid as an unauthorized tax”]). And, “where the charge imposed is for water actually consumed or services rendered it is not a tax” (State Univ. of N.Y. v Patterson, 42 AD2d at 329). “Additionally, the fee sought to be imposed ‘ “should be assessed or estimated on the basis of reliable factual studies or statistics” ’ ” (New York Tel. Co. v City of Amsterdam, 200 AD2d at 317, 318 [finding that the “fee” was a tax, as it was being exacted for revenue purposes, and that the $13 per square foot fee was disproportionate to the costs associated with issuing the excavation permit and subsequent inspections and enforcement, and was “in fact a revenue-raising measure”]).
The DEP’s initial proposal to increase the water rates by 2.1% included the Water Board’s rental payment obligation of $122 million, and, inter alia, other credits and initiatives. The record indicates that the initiatives, such as MCP, bore a relationship between use, albeit, conservation of use efforts and the rate charged; the record also indicates that credits, such as credits issued to certain senior citizens meeting certain income guidelines, have a rational basis tied to the economic needs faced by such classes of persons. Thus, the factoring in of the $122 million rental payment to the City, among other expenses, credits, initiatives, and costs, resulted in a revenue need that necessitated a 2.1% increase. According to the April *760 8th meeting minutes, the DEP concluded that the Water Board required $76 million in additional revenue in FY 2017 based upon a comparison of projected expenses (including the estimated rental payment of $122 million) to revenues derived from the water rates in FY 2016: “The revenue need for FY 2017 is projected to be $3.67 billion. Without a rate increase, projected FY 2017 revenues would be $3,594 billion, which would translate into a $76 million funding gap. Raising rates by 2.1% will fill the $76 million funding gap.” (Minutes of meeting of New York City Water Board, Apr. 8, 2016 at 3.)
Notably, the DEP proposal did not include any credit for $183, or credit to class 1 property owners.
However, the Mayor’s subsequent decision to forgo the remaining $122 million rental payment owed by the Water Board overcompensated for the $76 million deficit, thereby resulting in a $46 million surplus. Therefore, inasmuch as the Water Board’s subsequent 2.1% fee increase correlates directly to the sum of credits issued to class 1 owners, such 2.1% fee increase can only be viewed as solely to fund the $183 bill credit, and (unlike the credits in DEP’s proposal) cannot be said to be for the “use of, or services furnished, rendered or made available by, the sewerage system or water system.” Indeed, unlike the credits accounted for in DEP’s proposal, the re-created 2.1% increase to be applied to all rate payers was birthed solely from the credit benefiting class 1 property owners, without any showing by the respondents that such credit was rationally related to any economic or other qualifications of members of such class. That credits have been issued by the Water Board historically is insufficient as a basis to support the issuance of bill credit herein.
While the petitioners’ view of the bill credit as a thinly disguised bonus from the Mayor to a specific class overshadows the intent to provide relief and support affordable housing in the city, the intent is trumped by the aforementioned case law, and though laudable, is marred by faulty execution. Unlike the express legislative provision in Elmwood-Utica Houses v Buffalo Sewer Auth. (65 NY2d 489 [1985]), which permitted the practice of the Buffalo Sewer Authority of not charging certain classes of properties for an ad valorem component of sewer rents, no such provision has been made by the legislature visa-vis the Water Board’s authority to charge, or not charge, the class 1 properties herein. The Court of Appeals in Elmwood-Utica Houses recognized that the legislature’s judgment therein *761 to serve the economic and public policy goals, including economic differentiations among its charges, did not involve any “invidious discriminations condemned by statute or Constitution” (id. at 497). While the distinction between class 1 and other classes of properties in this instance would not appear to be based on invidious discriminations condemned by statute or Constitution, the authority to issue the bill credit was not expressly granted to the Water Board by the legislature. And, while a rational basis may exist to “credit” certain classes of homeowners in order to “defray the costs of the public benefit services supplied by” the water and sewer system (Elmwood-Utica Houses at 497-498), in the absence of any enabling statute authorizing the issuance of “credit” on the basis of property class distinctions, the Water Board lacks the authority to issue such credit.
As to General Municipal Law § 94, entitled “Earnings of municipal corporations from certain municipally operated public utility services,” this section provides, in relevant part, that
“[p]rofits resulting from the operation of such a public utility service may be used for the payment of expenses or obligations incurred by such municipal corporation for municipal purposes or for the payment of refunds to consumers. The provisions of this section shall not apply to any gas, electric or water public utility service operated by the city of New York or any agency thereof.”
However, Public Authorities Law § 1045-bb expressly states that, “[i]nsofar as the provisions of this title are inconsistent with the provisions of any other law, general, special or local or of the city charter or any local law, ordinance or resolution of the city, the provisions of this title shall be controlling.”
And, respondents’ reliance on Carey Transp. v Triborough Bridge & Tunnel Auth. (38 NY2d 545 [1976], cert denied 429 US 830 [1976]) to support the issuance of the bill credit is misplaced. In Carey, plaintiffs challenged a bridge and tunnel authority’s different rates imposed on essentially identical buses. The issue is not the establishment of different rates, but the authority to issue credits.
As respondents failed to demonstrate that, under these specific circumstances, they had authority to approve the 2.1% increase and bill credit pursuant to either the Public Authorities Law or the financing agreement, the resolutions were arbitrary, capricious, and unreasonable, as a matter of law.
*762 Conclusion
Based on the foregoing, it is hereby ordered, adjudged and declared pursuant to CPLR 7803 (2) that the resolution of respondent New York City Water Board, approving on May 20, 2016 (a) a 2.1% increase to water rates and water and wastewater charges for FY 2017 for users of the water supply and wastewater system of the system of the City of New York, and (b) a onetime bill credit for class 1 rate payers was ultra vires and exceeded the Water Board’s statutory authority; and it is further ordered, adjudged and declared pursuant to CPLR 7803 (3) that the resolution of the Water Board adopting the rate schedule for FY 2017 and approving the rate increase for users of the water supply and wastewater system of the system of the City, and the bill credit, was unreasonable, arbitrary, capricious and an abuse of discretion; and it is further ordered, adjudged and declared that pursuant to CPLR 7803, the rate increase and bill credit as provided for in the resolution and the rate schedule is hereby annulled and vacated; and it is further ordered, adjudged and declared pursuant to CPLR 7805 and 6301 that respondents, their agents and employees and all persons acting in concert with respondents are enjoined from enforcing or implementing the rate increase or bill credit provided for in the resolution and/or rate schedule; and it is further ordered, adjudged and declared that the fiscal year 2016 New York City Water Board water and wastewater rate schedule remain in effect until further action by respondents.

. “Water Board” is defined in Public Authorities Law, article 5, title 2-A, § 1045-b as follows:
“18. Water board’ shall mean the water board or a sewer and water board, as the case may be, created by a special act of the state legislature, for the city as a body corporate and politic, constituting a public benefit corporation, and having the powers and duties as provided in this title.”

. Public Authorities Law, article 5, title 2-a, § 1045-f, entitled “Water board,” provides as follows:
“1. A city water board may be created by a special act of the state legislature at the request of the city, as a body corporate and politic, constituting a corporate municipal instrumentality of the state and having the powers and duties as provided in this title.
“2. The water board shall consist of seven members appointed by the mayor. . . .
“9. It is hereby determined and declared that the water board and the carrying out of its powers and duties are in all respects for the benefit of the people of the city and the state, for the *748 improvement of their health, welfare and prosperity and that such purposes are public purposes and that the water board is and will be performing an essential governmental function in the exercise of the powers conferred upon it by this title.”

. The resolution means the bond resolution adopted by the New York City Municipal Water Finance Authority on November 14, 1985 authorizing the issuance of bonds (financing agreement, art I, definitions).

. The note resolution means the note resolution adopted by the New York City Municipal Water Finance Authority on June 26, 1985 (financing agreement, art I, definitions).

. DEP’s proposal noted that the Mayor reduced the Water Board’s rental payment by $82 million in FY 2016 and that the Mayor will reduce the rental payment “by $122 million.” According to the May 2016 New York City Water and Wastewater Rate Report—FY 2017, the Water Board’s rental payment for FY 2017 was an “estimated” “$244 million” (at 4, available at http:// www.nyc.gov/html/nycwaterboard/pdf/blue_book/nyc_rate_report_fyl7.pdf, cached at http ://www.nycourts. gov/reporter/webdocs/nyc_rate_report_fy 17 .pdf).

. According to respondents, the Mayor decided to forgo all of the rental payments for FY 2017 through FY 2020. And, although the onetime $183 credit at issue would be given only to class 1 account holders (which make up 80% of account holders), the savings would be passed on to all account holders in FY 2018 through 2020.

. Multi-borough hearings were held from May 5, 2016 through May 11, 2016.

. Department of Finance.

. Petitioners filed this article 78 proceeding for an order declaring that the Water Board acted outside of its authority and jurisdiction in approving the rate increase and bill credit, prohibiting the implementation of the rate increase and bill credit, maintaining the 2016 water rate schedule (first cause of action), invalidating, annulling and vacating the rate increase and bill credit as unreasonable, arbitrary, capricious and an abuse of discretion (second cause of action), and enjoining respondents from enforcing the rate increase and bill credit pending the resolution of this proceeding (third cause of action).

. According to the Water Board, it has a long-standing practice, “consistent with best practices in the public water supply industry, to set current year rates such that rate stability over at least a five-year forecast period is maintained. Minimizing rate increases in one year and then dramatically increasing rates in a subsequent year is not a practice that is typically favored by customers, and it is not consistent with strong credit ratings. As such, even if the $183 credit was eliminated, the Water Board would set FY 17 rates at approximately 2 percent to keep rates stable and consistent with rate increases projected through FY 2020.”

. Public Authorities Law § 1045-j (3), cited by respondents, mainly pertains to notice and public hearing requirements. The sole reference to “classes” of users is the requirement that “[t]he fees, rates, rents or other charges so established for any class of users of property served shall be extended to cover any additional premises thereafter served which are within the same class, without the necessity of a hearing thereon.”

. Other initiatives that do not reflect the cost of water and wastewater actually used are credits issued to those that receive a home energy assistance program grant, those that receive a senior citizens or disabled homeowners exemption, and senior citizens with an annual income less than $50,000.

. Respondents add that the water system is operated by DEP as an agent of the Water Board, and thus, DEP should be dismissed from this matter.

. Such initiatives include a $250 credit per unit for qualified multifamily affordable housing properties. Further, senior citizens with an annual income less than $50,000 will revert to a threshold of approximately $37,500.

. At oral argument on June 7, 2016, the court offered to carve out and address, as a separate component of preliminary injunctive relief analysis, the propriety of an interim, stay, considering the issues of, inter alia, “unnecessary economic waste.” Respondents declined the court’s offer, and requested decision on the full, substantive issues (tr at 32-33). At oral argument on June 20, 2016, the parties agreed for the court to address the merits of the petition, and that the issue of preliminary injunctive relief need not be decided.